IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 27, 2022

## RODNEY DEON PORTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 99326      Kyle A. Hixson, Judge

_____

### No. E2021-00915-CCA-R3-PC
_____

The petitioner, Rodney Deon Porter, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel on direct appeal. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Rodney Deon Porter.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Charme P. Allen, District Attorney General; and Sarah Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

The petitioner was convicted of felony murder in the perpetration of aggravated child abuse and aggravated child abuse "relat[ing] to the beating death of his seven-week-old daughter," and he was sentenced to an effective term of life plus twenty-five years' incarceration. *State v. Rodney Porter*, No. E2010-01014-CCA-R3-CD, 2011 WL 2766581, at *1 (Tenn. Crim. App. July 18, 2011), *perm. app. denied* (Tenn. Nov. 17, 2011). This Court affirmed his convictions and sentences on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. *Id.* The underlying facts of the case were summarized by this Court on direct appeal, as follows:

The [petitioner]'s convictions in this case relate to the beating death of his seven-week-old daughter, [the victim]. At trial, the victim's mother, Wendi Bowman, testified that the victim was born full-term and healthy on November 3, 2006. At that time, Ms. Bowman was dating and cohabiting with the [petitioner], the victim's father. On Christmas Day 2006, Ms. Bowman and the [petitioner] broke up, and the [petitioner] moved out of the residence. Three days later, after getting off of work at 11:00 p.m., Ms. Bowman became ill and asked the [petitioner] to take her to the hospital. The [petitioner] arrived sometime later, and the pair left the victim in the care of the [petitioner]'s mother, Wilma Cason, sometime between 3:00 a.m. and 4:00 a.m. on December 29, 2006.

. . .

Wilma Cason, the [petitioner]'s mother, testified that she agreed to keep the victim on December 29, 2006, while the [petitioner] took Ms. Bowman to the hospital. At approximately 8:00 a.m., the [petitioner] picked up the victim from Ms. Cason's place of employment. At some point during the day, the [petitioner] telephoned Ms. Cason and asked her to babysit the victim later that evening. She agreed, and the [petitioner] dropped the victim off at Ms. Cason's residence at approximately 6:45 p.m. The [petitioner] left after approximately 10 minutes, and Ms. Cason went to get the baby out of her car seat. Ms. Cason testified that at that time, the victim was pale and did not appear to be reacting to her voice. She said she immediately telephoned the [petitioner] and told him something was wrong with the victim and that she needed to be seen by a doctor. Ms. Cason stated she then telephoned her daughter, who advised her to call 9-1-1. The [petitioner] came back a short time later and took the victim to the hospital. Ms. Cason denied telling the [petitioner] that the victim was jaundiced.

Doctor Paul B. Schneider, the pediatrician who treated the victim upon her arrival at ETCH on December 29, 2006, testified that the victim "had a decreased level of consciousness. Her pupils were dilated. She was not responsive at all. Her soft spot was bulging. She was very tachycardi[c]. So her heart rate was around 200. She was breathing very fast and erratically, and she had bilateral retinal hemorrhages noted on microscopic examination." Doctor Schneider, who took a history from the [petitioner] that included a denial of any trauma to the victim, stated that the victim's "presentation was very consistent with shaken baby [syndrome]." Doctor Schneider ordered a computerized tomography ("CT") scan of the victim's brain, and the scan revealed "diffuse cerebral edema and acute midline

subdural hematoma, bone fragments along the . . . right lamboid suture and probable small frontal contusions versus hemorrhage." Doctor Schneider testified that the injuries revealed in the CT scan were consistent with his initial diagnosis of shaken baby syndrome. Doctor Schneider said that the victim's condition upon her admission to the hospital was "[v]ery critical" and that, once her airway was stabilized, she was transferred to the PICU under a "very grim" prognosis. He said that at that point it "was not clear if she was going to die or to survive and have minimal functioning capacity."

Doctor Schneider testified that neither childbirth nor cardiopulmonary resuscitation would have caused the victim's retinal hemorrhaging, but a serious fall had the potential to result in retinal hemorrhaging. He added, however, that it was "very unlikely" that the victim's injuries could have been caused by the [petitioner]'s dropping the victim from his lap onto a carpeted floor.

Doctor Matthew Hill, a Pediatric Intensive Care Specialist on call when the victim was brought in, described the victim's condition, "When she first arrived in the hospital, she was having respiratory distress. She was ashen and pale. She was having agonal respirations. . . . Her pupils, when she arrived in the door, were fixed and dilated, meaning they did not respond to light."

. . .

Doctor Hill opined that the victim's injuries were "non accidental trauma. This was consistent with what we call 'shaken baby syndrome.'" He testified that evidence of the victim's injuries would have appeared "within an hour or two" and that the injuries could have been inflicted "anywhere within two hours to 12 hours" of her arrival at the hospital. He said that he had "not seen this compound of injuries, the type of injuries [.] . . other than as a shaken baby without a significant history of trauma, like a motor vehicle accident or something like that." A fall from accidental dropping or even a fall from bouncing off of a bed would not have caused such severe injuries.

In gathering a history, he specifically asked whether the victim had experienced any trauma, and the [petitioner] told him that she had not. Doctor Hill then performed blood work and several scans to rule out various causes for her symptoms as well as a spinal tap to rule out an infection. The spinal tap revealed "a massive amount of protein in her [cerebral spinal

fluid], which [indicated] that she had significant loss of brain cell function, and her brain [ ] . . . cells were dying at that time." Doctor Hill described the amount of protein present in the victim's cerebral spinal fluid as "as high as [he had] ever seen in a tap." Doctor Hill said that at that point, there was "not much" medical personnel could do other than supportive care because they could not "reverse the injury that's already happened to the brain." He testified that medical personnel tried a variety of interventions designed to limit the extent of the injury to "preserve injured brain that's still viable," all to no avail. He explained, "Based upon her presentation and the degree of edema, . . . [her] prognosis was very, very poor. The only thing that was keeping her alive at that time was the fact that she was seven weeks old, and . . . the plates of her skull had not sutured together." He elaborated that the space between the plates of the victim's skull allowed the pressure in her brain to expand her head outward and relieve pressure on the brain stem, which permitted some brain stem function. He said it was simply "too late" to save the victim by the time she arrived at the hospital.

Doctor Hill testified that he told both the [petitioner] and Ms. Bowman that the victim had "suffered a traumatic injury" and that she likely would not survive. He said that Ms. Bowman "was hysterical" at the news but could not recall the [petitioner]'s reaction. He recalled that he discussed with Ms. Bowman "how far she wanted to go with [the victim's] care and . . . treatment" given her poor prognosis and the fact that "[s]he was going to be severely, severely impaired if she survived." "After four or five days," it became apparent to medical personnel that the victim "was going to survive these injuries in a very bad neurologic state."

. . .

Knoxville Police Department ("KPD") Officer Bryan Davis testified that he was called to ETCH on December 29, 2006, and informed by medical staff that the victim had suffered "severe trauma to the head and a possible brain injury." Officer Davis said that he spoke with the [petitioner], who initially denied that the victim had suffered any trauma. Later during the initial interview, however, the [petitioner] told the officers present "that during a diaper change the child was laying [sic] in his lap and that at some point he reached to grab . . . some . . . item, and when he did, the child accidentally fell off his lap onto the floor." Officer Davis said that the [petitioner] claimed that the victim cried a bit after the fall but that he was able to console her eventually.

- 4 -

Officer Davis said that he related the [petitioner]'s version of events to medical staff, who told him "that there was no way" that such a fall "could have caused the injuries that the victim suffered." At that point, Officer Davis returned to the small waiting room where he had conducted the initial interview with the [petitioner] and provided the [petitioner] with *Miranda* warnings before questioning him a second time. During this second interview, the [petitioner] maintained that he simply dropped the victim from his lap onto the carpeted floor during a diaper change. At that point, the officers left the room to consider their options. Following a brief discussion, KPD Investigator Greg McKnight returned to the waiting room to speak to the [petitioner] a third time unaccompanied by other officers.

Investigator McKnight testified that he went into the waiting room to speak with the [petitioner] "man to man" in an attempt to get the [petitioner] to reveal the true origin of the victim's injuries. Investigator McKnight said that during this third interview, the [petitioner] "finally admitted what he had done," telling the officer "that the baby wouldn't stop crying. He said he had the baby in his arms, and he said he just lost it and threw the baby on the bed, and the baby hit – from the bed, the baby hit on the floor, against the wall." The [petitioner] then provided the following statement written in his own handwriting:

> Amya Neveah Porter daughter of Rodney D. Porter. I love my baby very true and deep and I am making this statement in hope and belief that God will rescue my baby to[ ] live and see the beginning of her life. When Amya started to cry after I dropped her in the middle of a pamper change and I couldn't soothe her, I then became short in my parental patience and took her to the bedroom and tossed her on the bed but she bounced off and onto the floor where her head hit the wall. No one reading this statement has to forgive me but my daughter[.] I will care to be forgave by mostly. May God take this and make me a great father to my only daughter/child.

Investigator McKnight adamantly denied telling the [petitioner] what details to provide in his written statement.

Pediatric Opthamologist Doctor Gary Gitschlag examined the victim on December 30, 2006, and testified that "she showed a significant amount of hemorrhaging [that] more or less covered the inside of the retina." He stated that although there are "myriad" causes of retinal hemorrhage, in cases

of child abuse, retinal hemorrhage occurs along with intercranial bleeding. He testified that the "massive" amount of hemorrhaging present in the victim was consistent with child abuse. He said the victim's injuries were "strongly suggestive of shaken baby syndrome" and were not likely caused by "a simple fall from the bed or something." He said that although "minor hemorrhages" can be caused by falls, "even massive car injuries with crush" do not cause "that sort of massive retinal hemorrhage in an infant this size." He emphasized, "[][M]assive subdural hemorrhages with multiple fractures and mass retinal bleeding in a three month old dying of bleeding diathesis would be indicative of a shaken baby syndrome. I can think of no other pathology."

Doctor Gitschlag last examined the victim in March 2006, and at that time "she still showed significant vitreal retinal hemorrhage." Doctor Gitschlag said the victim needed surgery to "remove the blood from the chamber, and if there's a detached retina, try to reattach it." He recalled that the surgery was not performed "because of her prognosis as far as longevity . . . the risks were not sufficiently outweighed by the benefits."

Doctor Marymer Patricia Perales, a pediatrician with a specialty in "child abuse pediatrics," which she said "focuses in on the area of child abuse," testified that she became involved in the victim's case after the victim survived her first night in the PICU. At that time, the victim's brain was swollen and there was evidence that she had suffered a "hypoxic event," meaning that her brain had been deprived of oxygen. The victim also had "diffuse retinal hemorrhages, meaning [hemorrhages were present] everywhere you looked in her eye." After examining the victim and her medical records, Doctor Perales concluded that the victim had suffered "inflicted head trauma," meaning she had received a non-accidental injury. Doctor Perales said that the force required to inflict such an injury was "enough that if anyone witnessed the force that was being used they would know that it was inappropriate force or excessive force." She adamantly maintained that an accidental fall could not have caused the victim's injuries.

Once the victim was moved to the regular patient floor, Doctor Perales was one of her treating physicians. She discharged the victim after the victim passed a "barium swallow" test, but the victim was readmitted to the hospital two days later "for gagging and choking." At that point, the victim's prognosis was very grim. She explained, "We take care of children who have brain injury a lot, and you know, again, they may recover and have a period of doing better, but they will always continuously decline, and at some point

their brain will say, I cannot do this anymore, and it will stop." Doctor Perales explained that the victim's brief period of improvement was due to the decrease in swelling but that later CT scans showed that the victim's "brain was no longer there. There were no brain cells there. There was no myelin sheath there to myelinate. There was nothing there."

Doctor Perales testified that upon the victim's final readmission to the hospital, it was clear that the victim's death was imminent. Doctor Perales testified that she was aware that the victim was prescribed morphine just before her death, a medication that Doctor Perales felt was medically necessary because the victim "was very spastic" and "was in pain for that and other reasons." Doctor Perales testified that she was not at all surprised when the victim died because she was certain from the beginning that the victim would eventually succumb to her injuries.

Pediatric Neurologist Doctor Anna Kosentka testified that when she first examined the victim, the victim was "comatose, responsive only to major painful stimulation . . . and her pupils were sluggishly reactive." After obtaining a full history, Doctor Kosentka concluded that the victim "was involved in some traumatic event." Doctor Kosentka testified that she continued to consult in the victim's treatment during her initial hospital stay. During that time, she performed "three or four" electroencephalograms ("EEG") on the victim, each of which showed abnormal brain activity and "confirmed abnormal findings on [the victim's] CT."

Doctor Kosentka also treated the victim following her initial discharge in January 2007 and during her subsequent hospitalizations and last saw the victim at the end of May 2007. She testified that the victim's prognosis from the beginning was "extremely poor," which Doctor Kosentka explained to mean that "based on several tests, [magnetic resonance imaging] of the brain, a consultation with the neurosurgeon, several EEGs, and her clinical presentation suggested that her life expectation [was] short, and she did not have any . . . signs for recovery from this injury."

Doctor Kosentka stated that despite some initial slight improvement in her symptoms, the victim's "brain function did not improve clinically" and, in fact, continued to decline until her "brain activity was minimal." The victim continued to have seizures, described "as arching back and episode of muscle stiffening" and "occasionally some jerking movements with the face, sometimes with the legs." Doctor Kosentka prescribed both clonazepam and phenobarbital for the seizure activity. During the victim's final

hospitalization, the victim "presented with episodes of pain" manifested in "extreme irritability, episodes of screaming, crying," leading Doctor Kosentka to prescribe morphine "[t]o control her pain and to provide some comfort" for the victim. Doctor Kosentka testified that when she prescribed the morphine, she specifically told Ms. Bowman to discontinue giving the victim hydrocodone for pain.

Karen Sharp, a nurse at ETCH, testified that she was assigned to provide home health assistance to the victim as part of the "interval program" to help the family "through the process" of the victim's terminal illness. She stated that she showed the victim's family how to operate the g-tube and also provided some "compassionate care," which she described as "like a [h]ospice for children." Ms. Sharp said that in June 2007, the victim had more bad days than good days, was unable to tolerate her feedings, and was "staying irritable all the time and crying." On the day that she died, the victim experienced several episodes where she stopped breathing for a few seconds or minutes and then would take "a big gasp and start breathing again." Ms. Sharp testified that such behavior was a normal part of the dying process. On that day, the victim was being given morphine for irritability at the level prescribed by Doctor Kosentka. Ms. Sharp said that she could not recall whether she or Ms. Bowman administered the final dose of morphine to the victim but that she did not generally administer the victim's medications.

Knox County Chief Medical Examiner Doctor Darinka Mileusnic-Polchan, who performed part of the victim's "complex" two-part autopsy, testified that evidence of bruising remained on the victim's brain even at the time of the autopsy, indicating a "severe impact" injury. Doctor Mileusnic-Polchan stated that because of the injury and the "tremendous swelling of the brain," the victim's "sutures" or soft-spots never came together. Further examination revealed a healing subdural hemorrhage that was an "indication there was a severe head trauma." Doctor Mileusnic-Polchan explained that the brain "should be nice, healthy looking gray, tan, oval sort of organ that has a lot of gyri, like a little nubbins, and a sulci, the little crevices that separate them." The victim's brain, by contrast, was "essentially, an empty sack. There's no normal brain tissue left." She said, "The only structure that really has some normal appearance would be the . . . distal brain stem, the lower brain stem and the spinal cord itself, and even there we have . . . some shrinking." She explained that the "disappearance of the brain substance was a gradual process." She said that the victim's injury was irreparable and

irreversible and that the fact that she lived as long as she did "would indicate really good care."

Doctor Mileusnic-Polchan testified that in addition to the injuries that indicated a lack of oxygen to the brain, there was an area of bruising that indicated a direct impact "in the area of the forehead." She said that toward the end of her life, the victim "had no brain control whatsoever, that the brain was not there. The only thing that really maintained her life was some vital centers that remained in the brain stem for a while, but even that would disappear over time." She said that the victim "could feel the pain, but she could not process the pain the way we consciously process the pain."

Doctor Mileusnic-Polchan testified that examination of the victim's eyes confirmed the presence of retinal hemorrhaging and "tremendous scarring, tremendous change, that was clearly indicative the child was blind. Of course, she was blind because of the head and brain trauma, but even if that hadn't been the case, the eyes could not see any more." Doctor Mileusnic-Polchan said that the victim's constellation of injuries could not have resulted from a typical household fall and necessarily resulted from blunt force trauma to the head.

Doctor Mileusnic-Polchan testified that the victim had an "extremely high amount" of morphine in her system at the time of her death, enough to "kill any individual, adult, let alone the child." She said that the official cause of death was "the morphine intoxication due [to] global hemispheric microsis due to blunt head trauma which is the cause. It was of child abuse. So, yes, the morphine was listed as the final kind of mechanism that pushes her over the edge." She attributed the high level of morphine to "some sort of error in dosing." Nevertheless, she concluded that even without the morphine, the victim would "most likely" have died "relatively soon because she was developing pneumonia." She said that, in any event, the victim would "certainly" have died from the brain injury.

Following Doctor Mileusnic-Polchan's testimony, the State rested, and the [petitioner] took the stand. He testified that after taking Ms. Bowman to the hospital, he picked the victim up from Ms. Cason's house and took her with him to his Aunt Minnie Ruth's house. He said he left the victim with his aunt and did not return to pick her up until after midnight. He then took the victim to Ms. Bowman's apartment, where he changed her diaper and put her to bed. The [petitioner] said that the victim awoke at 3:00 a.m., and he "fed her a little bit." He testified that both he and the victim went back to

- 9 -

sleep and slept until 9:30 a.m. At that time, he gave the victim a bath. The [petitioner] testified that while he was getting the victim out of the bath, he "accidentally dropped her" and "she fell head first" onto the floor of the bathroom. He said that the baby cried for 10-15 minutes but eventually calmed down.

The [petitioner] testified that after the victim calmed down, he dressed her and returned to his Aunt Minnie Ruth's house. There he lay the sleeping victim on one couch while he went to take a nap on the other couch. The [petitioner] said that he woke up at approximately 2:00 p.m. and asked his aunt to watch the baby while he and his cousin went to visit a mutual friend. He stated that the baby was asleep when he left and was still asleep when he returned to pick her up a couple of hours later. From his Aunt Minnie Ruth's, the [petitioner] took the victim to Ms. Cason's so that she could watch the baby while he went out. He said that he did not take the victim out of her car seat before leaving Ms. Cason's residence. Shortly after he left, Ms. Cason called and told him that he needed to take the victim to the hospital because "she's yellow, look like she got jaundice or something."

The [petitioner] testified that he took the victim to ETCH, and she was immediately taken into a "small examination room" where they remained for approximately 30 minutes while the doctor examined the victim. He claimed that doctors never told him the victim was in dire condition and that he never suspected "anything [was] wrong with her but what [his] mama said." At some point, doctors took the victim away for testing but did not tell him that she was gravely ill. The [petitioner] claimed that a woman that he did not know came into the room, told him that he should not leave the room, and then remained there with him and his sister. He said that the woman eventually directed him and his sister to a waiting area just outside the entrance to the PICU and that he remained there for approximately half an hour before he was taken into another room.

The [petitioner] said that while he waited in this smaller room, officers arrived and questioned him about the injuries. He testified that they told him that the victim had various fractured bones and asked him how she had come to be injured. He claimed that he eventually told them the story about throwing the victim onto the bed because he felt "like [he] had to give these people some kind of answer to something." He said he "felt responsible" for the victim's condition even though he had not himself inflicted any injury and that Officer McKnight had provided him with the "story" of his throwing the victim onto the bed. The [petitioner] stated that the story was his attempt

- 10 -

to protect his aunt or cousin in the event that they had injured the baby. He maintained that he had never purposely injured the victim and that any harm "was an accident."

During cross-examination, the [petitioner] described dropping the victim from a height of 44 inches onto the bathroom floor and admitted that he never told anyone that he had dropped the victim in the bathroom. The [petitioner] could not explain why he would willingly provide a false story that he dropped the victim while changing her diaper but would not tell authorities or medical personnel that he had actually dropped her in the bath.

The [petitioner] testified that despite their testimony to the contrary, neither Doctor Hill nor Doctor Schneider communicated to him the victim's condition or her dire prognosis. He claimed that he continued to believe the victim was suffering from jaundice until he was questioned by police. He also said that despite her testimony to the contrary, he never told Ms. Bowman to come with him because the doctor wanted to talk with them about the victim. The [petitioner] said that when he realized the victim was seriously injured, he "figured that something had to take place while she wasn't in [his] care."

*Id.* at *1-*9.

The petitioner filed a timely pro se petition for post-conviction relief in 2012 in which he alleged multiple grounds of ineffective assistance of counsel. After a nine-year delay for reasons not entirely clear in the record, an amended petition was filed by appointed counsel in April 2021. Relevant to this appeal, the petitioner claimed he received ineffective assistance of counsel on direct appeal because appellate counsel did not challenge the inclusion of jury instructions related to causation contained in Tennessee Pattern Jury Instruction 42.14.

The post-conviction court conducted an evidentiary hearing, at which the petitioner testified concerning his various complaints with trial and appellate counsels' performance.[1] The petitioner stated he did not talk to appellate counsel about his appeal, and he "didn't even know he was my lawyer until [appellate counsel] wrote and told me that he'd already put in an appeal." The petitioner said that had appellate counsel discussed the issues he wanted to raise beforehand, the petitioner would have had counsel raise an issue about the

---

[1] We limit our recitation of the testimony at the evidentiary hearing to that relevant to the petitioner's issue on appeal.

jury instructions because he "d[id]n't think that maybe the jury was listening so much as to the . . . defense side. . . . [a]s they were . . . to the district attorney[.]"

Appellate counsel testified that he represented the petitioner on direct appeal more than a decade earlier. At the time, he had practiced criminal law for approximately twelve years and had worked on numerous appeals prior to the petitioner's. Due to the length of time that had passed and his no longer having the petitioner's case file, appellate counsel could not specifically recall what communications he had with the petitioner but said he would have had some degree of communication. Therefore, he explained his normal procedure when undertaking representation on appeal:

> I'll try to contact them usually by letter and let them know what the process is; that the appeal is pending and that I'm going to be reviewing the record and looking at the different issues to try to file and let them know if they have any questions they can write to me[.]

Appellate counsel explained he would not know a lot about the case early on and had to get access to the record and transcripts, which he would read to determine what disputed issues, facts, and legal arguments arose at trial. He usually spoke with counsel from trial, which he believed he did in this case. From his review, appellate counsel determined what issues "could be supported or potentially reversible error on direct appeal."

With regard to the petitioner's claim concerning the jury instructions, appellate counsel could not recall what jury instructions were disputed at trial, if any. However, had there been a dispute at trial, counsel "would have researched the question to see what instructions were appropriate, whether the instructions given in this case were appropriate, . . . if the attorney had raised that issue, if there'd been argument about it at trial." Therefore, he surmised that he must have "determined that [he] didn't see any particular problem with the jury instructions that were given in this case such that I could argue that there was any issue that would cause reversible error." Appellate counsel recalled "the main issue that needed to be reviewed was sufficiency of the evidence."

On cross-examination, appellate counsel did not have "specific recollection of whether [he] met or talked to [the petitioner] in-person." He said that in the majority of cases, he did not have telephone conversations with his clients, but instead, usually communicated through letters. However, he could not recall how many letters he sent the petitioner regarding the appeal. Appellate counsel said it was his custom to send a letter to his client outlining the issues he intended to raise on appeal once he identified the issues. Appellate counsel did not typically send a draft version of the appellate brief to his client

in order to receive feedback because "there's not a lot of time for that[]" due to the deadlines in the appellate process.

Following the conclusion of the hearing, the post-conviction court entered a written order denying relief. The post-conviction court noted the pattern jury instruction at issue pertaining to proximate cause of death in homicide cases was specifically suggested by the Tennessee Supreme Court in *State v. Farner*, 66 S.W.3d 188, 206 n.18 (Tenn. 2001), and the trial court's "inclusion of the instruction would have been given deference on appeal due to the explicit suggestion of this language by the *Farner* court." The post-conviction court observed appellate counsel's omission of the issue on direct appeal was not "'significant and obvious' given the state of the law at the time" of the direct appeal and "[i]ndeed, the paragraphs of the instruction challenged by the petitioner were absolutely essential given the facts of this case." Accordingly, the post-conviction court concluded appellate counsel was not deficient for omitting the issue, nor would inclusion of the issue have changed the outcome of the direct appeal.

## *Analysis*

On appeal, the petitioner challenges the post-conviction court's finding that the petitioner received effective assistance of counsel on direct appeal. He asserts appellate counsel rendered ineffective assistance by failing to argue that the trial court gave erroneous instructions to the jury. The State contends that only did the post-conviction court correctly determine there was no deficiency in counsel's representation, but also that the "petitioner cannot meet his burden of establishing prejudice, as the outcome of his appeal would not have changed even if appellate counsel had raised the jury instruction for review." Upon our review of the record and the applicable law, we agree with the State.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

- 13 -

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999)). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Id.* Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

The record in the underlying case reveals several discussions during the petitioner's trial concerning the inclusion of Tennessee Pattern Jury Instruction 42.14 pertaining to proximate cause of death in the jury charge. The petitioner contested portions of the pattern instruction, but the trial court ultimately decided the entire pattern charge was proper and charged the jury as follows:

> Before the defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant. The proximate cause of death is that cause which, in natural and continuous sequence, unbroken by any independent intervening cause, produces the death and without which the death would not have occurred.

> The defendant's conduct need not be the sole or immediate cause of death. The acts of two or more persons may work concurrently to proximately cause the death, and in such a case, each of the participating acts is regarded as a proximate cause. It is not a defense that the negligent conduct of the deceased may also have been a proximate cause of the death.

> However, it is a defense to homicide if the proof shows that the death was caused by an independent intervening act of the deceased or another which the defendant, in the exercise of ordinary care, could not reasonably have anticipated as likely to happen. However, if, in the exercise of ordinary

- 15 -

care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original conduct, and the defendant's conduct is considered the proximate cause of death. It is not necessary that the sequence of events or the particular injury is foreseeable. It is only necessary that the death fall within the general field of danger which the [petitioner] should have reasonably anticipated.

If some other circumstance caused the victim's death, unrelated to the defendant's actions, that would be a defense to homicide unless the circumstance was the natural result of the defendant's act.

There is evidence in this case that the deceased required medical attention as a result of injuries that may have been unlawfully inflicted by the defendant, and that such treatment itself may have contributed to the death of the deceased. If you find this evidence to be true, then you must determine whether the medical treatment is of such a character as to relieve the defendant of the responsibility for the death. One who unlawfully and seriously injures another to the extent that medical attention is required bears the risk that improper treatment may result in the death of the injured person. If the defendant unlawfully and seriously injured the deceased, he is not relieved of responsibility unless the treatment was performed in a grossly negligent and unskillful manner and unless it was the sole cause of the death.

If you find that the defendant's acts, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must find him not guilty.

At trial, the petitioner specifically contested the inclusion of the paragraphs concerning his conduct needing not to be the sole or immediate cause of death, and about the deceased requiring medical attention and such medical attention possibly contributing to the death. He asserted the instruction would impair his ability to argue the victim died due to "intentional euthanasia by morphine overdose" and not from physical trauma inflicted by him.

Again, on appeal, the petitioner argues he received ineffective assistance of counsel on direct appeal because appellate counsel failed to challenge the inclusion of the aforementioned instructions. However, the petitioner has failed to prove appellate counsel rendered deficient performance or that he suffered any prejudice.

At the evidentiary hearing, appellate counsel testified that due to the long lapse of time he could not specifically recall if any jury instructions were disputed at trial.

However, counsel stated that had there been a dispute, he "would have researched the question to see what instructions were appropriate, whether the instructions given in this case were appropriate, . . . if the attorney had raised that issue, if there'd been argument about it at trial." Therefore, he surmised that he must have "determined that [he] didn't see any particular problem with the jury instructions that were given in this case such that [he] could argue that there was any issue that would cause reversible error." Moreover, counsel explained that the "only contested issue" was whether the State proved the petitioner's "culpability for the injuries that happened to the child." Therefore, counsel stated that "the main issue that needed to be reviewed was sufficiency of the evidence." Also, as noted by the State, our supreme court has held that in cases in which "causation [is] seriously and forcefully disputed" the causation instruction must be given. *Farner*, 66 S.W.3d at 204-05.

Based on the foregoing, the post-conviction court correctly determined appellate counsel was not deficient in his representation of the petitioner on appeal. Appellate counsel reviewed the record and determined the only contested issue was culpability. Thus, the trial courts inclusion of the challenged instruction on causation was proper. Counsel cannot be held to have rendered deficient performance for choosing not to raise an unmeritorious claim. Moreover, in light of precedent and the overwhelming proof of causation as outlined by this Court on direct appeal, the petitioner cannot establish prejudice as it is likely this Court would have rejected any argument challenging the inclusion of the causation instruction, and therefore, the petitioner's appeal would not have been different. Accordingly, the ruling of the post-conviction court is affirmed.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE